Joshua Webb et al v. USA et al. Fifteen minutes per side for argument. The 15 minutes to be shared by the defendants. Mr. Lovey for the plaintiff appellant. Morning your honors. May it please the court. My name is John Lovey. I Your honors qualified immunity is obviously a very important doctrine. It plays an important role in our system. It protects law enforcement officers who make good faith mistakes, who are doing their job in good faith and reasonably misunderstand the law or accidentally step over the line. A doctrine like that has no applicability in a case like this where the allegations and the evidence is that law enforcement ran completely rampant over people's rights, that corruption was pervasive. And corruption is not just my word. That is a word used by this court to describe Operation Turnaround in the Robertson case. That's the finding of the DEA and the Department of Justice's OIG and the and the US Attorney's Office in the investigation that they conducted. They interviewed more than 50 witnesses. They looked at thousands of documents and they concluded that Lee Lucas had violated civil rights, had made false reports, had testified falsely, had gone to extraordinary lengths to cover up for the misdeeds of Jarrell Bray. And as this court found in Robertson, in some cases he did so in conjunction with Bray and knowingly framed people. And the Webb case is such a case. Let's cut to the chase here because in Robertson they didn't find liability. Judge Keith, in his concurrence, said he might have violated the rights of some other people. But how do you distinguish this from Robertson, particularly in terms of what happened before the grand jury? Because as I read it, your necessity and your strongest case is in what way Lucas testified falsely, provided false reports, and thereby undermined the usual sanctity of the grand jury indictment. And how does that differ from Robertson? Exactly, Your Honor. In Robertson, those were plaintiffs who had pled guilty. You know, not all of the Operation Turnaround participants were set up. And Robertson said, these plaintiffs can't show that their rights were violated. But Robertson specifically said, in some of the Operation Turnaround cases, law enforcement knowingly participated in the frame. And if you look at the We have direct evidence from Jarrell Bray, statements that he participated with Lucas knowingly to frame Josh Webb. He said it five different times when he was interviewed by the special agent. How do we fit that in with his recantation later in this trial? What's your best case to show that you can go back to the original statement against a sworn statement and subsequent? Well, I, it's almost, to me, so self-evident that you don't need a case. That if someone has a recantation, that for summary judgment purposes, Rule 56, you have evidence that he made the first statement. You had evidence that made the second statement. Both are evidence. And the jury would then decide which to credit. The opponents, at least in one of these cases, suggest it's like the idea if you make a deposition, you can't contradict that with a later affidavit. Exactly. That's the same thing. It's a summary judgment issue. Of course, that's backwards, Your Honor. He's, his first five statements when he was interviewed on June 7th, October 10th, November 6th, December 18th, January 25th, the first five times he told the story, he said, look, I'll tell you what happened. Is it under oath? It is not under oath, but it is admissible and it is evidence for Rule 56 purposes. And I think that's the law we're looking at is, is it Rule 56 evidence from which a jury could find that the statement was evidence. And that's what this is. Bray says, me and Lucas got together. Now, they're saying you have to disregard that evidence. And it's a jury argument, really. What they're saying is someday the jury may say, well, when Bray turned around and recanted later, the jury should disregard the first five statements he gave to the DEA and the Department of Justice. And maybe they could persuade a jury. But as a matter of law, that's why we have trials. Would you succeed in a trial if the man said he made a statement, but it wasn't under oath, but subsequently he made a statement under oath that's true? Could you support a judgment on your client's benefit? Absolutely. The first five statements, as corroborated by the Department of Justice Special Agent. Are they substantive evidence against a sworn statement? Yes, Your Honor. And the sworn statement, well, you could tell a jury, hey, that has more to do with what the jury would decide. And to Your Honor's earlier point about, you know, when you contradict something later in a deposition, these were his contemporaneous statements. And we don't know why Bray subsequently retracted. And frankly, that's because we didn't get depositions. We didn't get to ask Lucas, hey, did you talk to Bray and help him remember that maybe there wasn't this agreement? You know, in a normal civil case, we would have been able to explore this. Lucas in his affidavit suggested that he had personal knowledge that why Bray changed. He said it was something to do with retaliation. He was mad at me. You know, so apparently when Bray went from A to B, Lucas was in contact with him. We didn't get those depositions. But Your Honors, we have five statements from Jarrell Bray. Counsel, if we followed that. Now you've got to have a battalion on the other side. Kind of, can you go down the line quickly in terms of what you think about the others? That is, Lucas is clearly your lead horse here. Metcalf pled guilty. Gets a little thin after that, doesn't it? Well, Metcalf and Mayer together were responsible for the video. And Your Honors, they sort of downplayed the video in their briefs. And I'd like to undownplay it. The video, this is the video that allegedly was taken and then doesn't exist? Exactly, Your Honor. When we say allegedly, it wasn't allegedly taken. Bray says positive, I watched it with him. And there's not one client at that table who denies that it was taken, Your Honor. They're not saying there was no video. They're not saying anything about the video. And not only that, Your Honor, in other operation turnaround cases, there was video. So there's no reason to believe that there wasn't video. And nobody's saying that there wasn't video. All they're saying is, we don't know where that video is now. But other than its current non-existence, do you have anything that in fact provides evidence that, let's say, Metcalf and Mayer destroyed it? Well. Other than that one of them was, or both of them were supposed to be custodians of it. And that was gonna be my point. We have record evidence they were custodians of it. Obviously, it's within their control and then it disappears. And I wanna add on Metcalf's point, this isn't speculation. He pled guilty to perjury in another case for lying to a US attorney. He said the deal wasn't videotaped when in fact it was. And that, I would submit, is pretty powerful evidence that you could infer that this guy was willing to break the rules. He pled guilty to perjury. In that sense, it is collateral to this. I mean, it's close, but at the same time, it's not logically connected to whether he destroyed it. I mean, it's like he committed a murder and he conceded to that. If you get beyond Metcalf and Mayer, what do you have, or what would you think you have? Well, it gets thinner after Metcalf and Mayer. I will concede that. Okay. And by the way, Metcalf and Mayer both lost summary judgment in Mott, and so it's not unprecedented. But Cross, our main point against Cross, is that he was present at the alleged drug deal when Conrad was there, this guy who's my size, is pretending to be a guy who's 6'3", 260. He was also present at the Webb proffers. So Cross knows that these are not the same men. Cross can see with his own eyes that the guy I saw... You said at Webb's proffers? Yes. Okay. There was two proffers. So we can say, well... You mean Webb was arrested or brought in? Yes, exactly. So Cross knows it's not the same guy and he used stand ins over and over and over again. You can infer from that context that there's enough that Cross knows that they're faking deals. Okay. And I'm not gonna go through the evidence in the proffers, because I'm into the Operation Turnaround abuses, because I'm into my rebuttal time, but I do wanna use a little of my rebuttal time, make one more point. There's this history of abuses in Operation Turnaround, it's set forth in the brief. There was one in particular that I wanted to bring to the court's attention that really illustrates, and that's the Wheeler case. Roosevelt Williams, they're doing a drug, a fake deal, and some guy named Transo is standing in for Williams, or no, Robert Harris is standing in. And there's a Cleveland cop named Perry Wheeler at the deal with Lucas and the others, and he says, guys, that's not Roosevelt Williams. I know Roosevelt Williams, I've been surveying... That's not him. And you'd think that if they were legitimate law enforcement, some people might say, well, what do you mean that's not him? Bray, what do you mean that's not him? One of them's tall, dark, and socky, and the other one is small, thin, and light. And Perry is telling... The detective is telling their clients, this is not the same guy. Not only do they ignore that, but they then delete references to the Cleveland detective Wheeler in their subsequent reports so nobody else could pick up on it. So this... You have to prove that they, one, heard that, and second, they did something about it, right? I mean, you just... Somebody tell me that's not Roosevelt Williams and I'm just standing around and not doing anything. Right. That doesn't say that you're violating civil rights or something. Wheeler was sufficiently concerned that they were ignoring him and not asking more questions and not asking Bray that he made a cover your butt memo. He said, I told them, I told my supervisors, and nothing ever happened. And to follow up on your Honor's point, they then deleted references to Wheeler's participation at the deal so nobody could ask Wheeler. When the prosecutors got the to omit the fact that he... That's collateral to Webb specifically. It is, your Honor, but... Okay. You know, Judge Boyko's point... Save your time. Alright, I will. Thank you. Thank you, counsel. How are we gonna divide our time here? Just so we know what's coming. Good morning. May it please the court. I'm Lowell Sturgill from the Department of Justice, and I represent two DEA special agent, Robert Cross, and second, the United States. And the defendants have agreed that each of us will take five minutes. So I'll go first, then Mr. Roth, and then Mr. Downing. Okay. Mr. Cross, of course, has been sued in his individual capacity based on a Bivens theory. And in the Robertson case, this court said, of course, that a plaintiff can succeed on that kind of case only by showing that the individual defendant personally violated the plaintiff's rights. And that's what the plaintiffs cannot show here with respect to Cross. They've paid scant attention to Cross in their briefs and at argument this morning, and what they've said does not support a cause of action against Cross. For example, you've heard this morning the allegation that Cross was present at the scene of the drug deal, and thus would have seen that Webb was not the individual involved. Well, there's no evidence to support that. In fact, Cross's declaration specifically says he was on surveillance in that deal, but that he drove around and parked behind a gas station where he couldn't actually see the deal go down in order to avoid being observed. So Cross did not see the drug deal go down, would not have seen who was in the car and who was involved, and there is no evidence in the record to the contrary. Second, the plaintiffs make this allegation that Cross falsely identified Roosevelt Williams, and that was dealt with in the Roosevelt Williams case, and Cross was afforded some qualified immunity in that case. And as we've explained in this brief, Cross did not falsely identify Roosevelt Williams. All he did was explain that somebody had told him that Roosevelt Williams was involved. Now, that's very different because one officer is entitled to rely on what other officers tell them. So that evidence... That was sort of my question for Mr. Lovick, that just because somebody heard it, didn't do anything about it, does that make him guilty of liability here? It doesn't, and in fact, the allegation again is that Cross was at these proffer sessions where the government was telling Webb what the evidence was against him. Well, Cross had no basis for... He had no personal knowledge to make any judgments about whether those evidentiary proffers were correct or not, because he was not able to see the drug transaction. He never identified Webb. He didn't testify before the grand jury, and he did not monitor the telephone calls. Did he hear Wheeler supposedly say what Wheeler supposedly said at the Williams deal? No evidence of that, Your Honor. So the evidence of that is where Wheeler is saying what he said. Right. And again, Cross didn't observe that drug buy either, so he would have had no personal knowledge to make any judgments about whether Williams was involved or not. Now, the other thing they say in their brief, they didn't mention this morning, was that Cross was present when one officer said that Webb was not actually involved in this deal. This was where the officers were allegedly viewing this videotape. Well, the problem was Cross wasn't in the room. There's no evidence that Cross was among the group of individuals who were watching this alleged videotape. And I would say, I looked carefully at the brief where the plaintiffs make this allegation. There's no... If you look at the materials, Cross is not named in any of those materials. Now, beyond that, all they really have against Cross is this argument that they're entitled to rely on... They call it the broader conspiracy of what defendants are said to have done to other of the Mansfield plaintiffs. And this court in the Robertson decision ruled that kind of evidence out. Because again, the baseline proposition is that a plaintiff can prevail in one of these cases only by showing that the individual defendant personally violated the plaintiff's rights in that case, not with respect to some other case. So this... I don't know why they're continuing to argue this, because Robertson is the law on this now. Okay, counsel, then in terms of the... Let's go then to your representation of the US. If we should reverse on some of these other people, perhaps starting with the plaintiffs, do you have any additional defenses even if we did that or what were they? We do, Your Honor. The main defense is that the plaintiffs waived any opposition to the US's motion for summary judgment on the FDCA claims. And the way this happened is the US moved for summary judgment after the Bivens ruling came down, and the plaintiffs didn't file any kind of substantive response. What they said was, well, look, we've moved to reopen those Bivens judgments based on an argument that the government had misrepresented the nature of certain voluntary disclosures that it had made, and they asked for a delay, but they didn't actually substantively respond to our motion. Well, the district court said, there's no grounds for a delay, and then the district court denied the motion to reopen the Bivens judgments, so they've waived any response to that. And with regard to the claim that the US isn't liable, even if these other guys are liable? Well, the government... The US is only in the case on the FDCA claims. There's no Bivens. You can't have a Bivens claim against the United States. Alright. Any other questions, judges? Thank you. Thank you, Your Honor. May it please the court, my name is Thomas Roth and I represent Mr. Lucas. Opposing counsel, Mr. Lovie, never mentioned Mr. Lucas's grand jury presentation at all in their brief, in any of their briefs, despite the fact that this court in Robertson told us that if there is a grand jury presentation, the issue of probable cause becomes irrelevant, and the proper focus at that point is the grand jury presentation, Mr. Lucas's grand jury testimony. Nowhere before this court, in the last several minutes, and nowhere in their brief do they mention Mr. Lucas's grand jury testimony relating to Mr. Webb. And the reason is, there are clearly, and it is undisputed, there are no false statements in that grand jury presentation. And that, under the Robertson precedent, ends the inquiry. Is the testimony in front of the grand jury someplace in the record, or are you just saying that they didn't put it in to show that there was a false statement? Well, Your Honor, the only place I was able to find it was in the district court's opinion. The district court cited it in total, and concluded, reviewed it line by line and concluded, there are no false statements in it. The only possible argument you could make about the grand jury presentation being false is the identification of Mr. Webb as being the individual in the vehicle. However, it is with the exception of recanted and perjured testimony by Mr. Bray, there is no evidence in the record that Mr. Lucas knew that the person in the car was anyone other than Mr. Webb. So you don't think there's a genuine issue of material fact raised by the discrepancy in the sizes and so forth? No, Your Honor. The only discrepancy of any... Might be right, might be wrong, but that does seem to raise some question. Tell me... Well, the district court... The only possible discrepancy between the appearance of the two individuals is the size. There was a significant discrepancy in the size. The district court held, and Mr. Lucas testified, that he had no idea what the size of the individual was because he never saw him standing up. The individual was in the car when Mr. Lucas got in the car, and was still in the car. Mr. Lucas would have had no way of knowing the size of the individual. Were there documents that Lucas was, in part, responsible for that were presented to the grand jury? To my knowledge, there were no documents presented to the grand jury. It was on each and every instance, the sole evidence in front of the grand jury resulting in indictments for all of these man's field defendants was Mr. Lucas's testimony. He basically testified in a very summary fashion with respect to all of the defendants, including Mr. Webb. Didn't Mr. Lucas's... Didn't he identify certain information in these DEA 6 reports, and were those presented to the grand jury? To my knowledge, Your Honor, no. There was ample evidence to support Mr. Lucas's identification of Mr. Webb in the grand jury. First of all, Bray said it was Mr. Webb. Second of all, the individual in the car... Bray said it was Webb. Bray said it was Webb. You mean contemporaneously at the time? Yes. Or later on in the later statement? No, no. Going into the deal, everybody, all the law enforcement individuals were told by Mr. Bray that he was gonna be meeting with Mr. Webb. So that was understood going in. In addition, he introduces Mr. Webb to Mr. Lucas. Bray introduces Webb to Mr. Lucas as Josh. Josh is Mr. Webb's first name. In addition, Mr. Bray acknowledged at the Lucas criminal trial that he intentionally picked an individual to be the stand in for Mr. Webb that looked like Mr. Webb. They were both white gentlemen with shaved heads, tattoos, and heavy set. So when Mr... Well, the question, he says that, but there's evidence that Webb wasn't anywhere nearly as heavy set as Conrad, right? No, I think at the time... No, Mr. Webb, by the time he testified at the Lucas criminal trial, was much thinner than he was in 2005. As a matter of fact, I asked Mr. Webb on cross examination, has your appearance changed since 2005? I represented Mr. Lucas at the criminal trial. I asked him on cross examination, has your appearance changed? And he said, yes, I lost a lot of weight. I think he said he lost about 60 pounds. So they were both heavy set at the time. They were both white men with shaved heads and lots of tattoos on their bodies. Thank you, counsel. Go ahead. In order for the plaintiff in this case to prevail, doesn't he have to show through Mr. Bray that these things happened? Or is there other evidence to show that? He has to show it through Mr. Bray, which is why, Your Honor, he goes to prior perjured recanted statements. Can you support, or can the other side support, a judgment based upon a prior inconsistent statement that the witness says was false? They cannot. And I'm the one who analogized in my brief this to the sham affidavit doctrine. If you could take a statement from Mr. Bray, not under oath, which he admits is false, and which he recants, if you could use that, there would be no summary judgment. Rule 56 would be a nullity if people could come in and just contradict what they had said previously. You can't do that. But he does come in and contradict what he said previously. He said it previously. I understand. Your side that has the recantation, I mean, that's why it's not analogous. I mean, it may be persuasive, but it's not analogous because the reason you don't do the other is you get to see where the holes are, and then you contradict them. Here, it's the other way around. I understand that, but I think the policy behind the sham affidavit doctrine and the issue we have here is the same. You can't... First of all, from a public policy standpoint, you can't encourage perjured and false statements to... I mean, counsel, we send people to their death based on prior and later recanted statements. I've sat on 20 death penalty cases and probably a third of them, there's somebody who testified at the trial who recants. So we can't say that a recanted statement proves that the first statement was perjured. Well, I understand, Your Honor, but I think if you're going to permit this, it's fraught with mischief because it really... It gives people the ability to nullify a Rule 56 summary judgment motion where whenever they feel like it. Thank you, counsel. Thank you, Your Honor. It's fired. It pleases the court. My name is Dan Downey and I'm here on behalf of Officers George, Mayer, and Faith. I'd like to begin by noting that the Lucas grand jury testimony is contained within the sealed exhibit at A75. So I believe that is a complete part of the record. Mr. George had no involvement in the drug buy involving Mr. Webb. He simply was a probation officer who was present when Mr. Webb was arrested well after the fact. There is no liability that can possibly attach. And frankly, his name does not appear prominently in the appellant's brief. Again, Captain Faith was not present for this buy either. There is really no legitimate basis for maintaining a cause of action against him in this case. It is likely that when these cases were filed, they sued virtually everybody that could have potentially touched a file. Faith comes up a little more in price, doesn't he? Correct. We'll wait for that, but that's a difference. Correct, Your Honor. And so realistically, Sergeant Mayer is the only person that I represent who was present for the videotape that existed through the statements that Mr. Bray may have made to Ms. Thomas during the course of the federal investigation. I would encourage the court to give respect and deference to the federal investigation that was conducted. It went on for a couple of years. It was very thorough. And the investigation determined that Jarell Bray had told lies throughout the course of the early investigation. When Jarell Bray stood up and swore an oath at the criminal trial of Mr. Lucas, the federal attorneys who were presenting that case, I think, had to believe that Mr. Bray was telling what he believed to be the truth, what they believed to be the truth after conducting their investigation. And certainly, they are duty bound, as we all are, not to perpetrate a fraud upon the court. And so I think Mr. Bray's sworn testimony at trial carries more weight than anything he may have said in the course of those early interviews when Mr. Bray was really concerned with, I think... But isn't the issue not whether it carries more weight, but whether it carries so much weight that there's no genuine issue whatsoever? I understand, Your Honor. And certainly, the sham affidavit doctrine that Mr. Roth addressed has come up in other cases that involves this particular set of facts. And I know the court struck the affidavit as being a sham. It was one that Mr. Bray had provided even after his testimony at the Lucas criminal trial. That was in the later sequence, not the earlier sequence. Correct, Your Honor. We'll just go back to... Time is fleeting. In Mr. Mayer's case, again, if subjunctively, we were to say that the grand jury indictment on its face does not knock everything out, what would distinguish Mayer? That is, is there... Is his participation in the video enough to keep him in here? Was that video presented at the grand jury or referred to at the grand jury? Absolutely not, Your Honor. And from the interviews that are in the case that have been submitted, Sergeant Mayer had no involvement in the grand jury, the decision to prosecute, what charges would be proffered, no involvement whatsoever. And frankly, the video has, I think, it's my position, has only become an issue really before the Court of Appeals. It wasn't fully addressed before Judge Boyko. I know that if you review his decision, scant attention is paid to that. It was only after this case was brought up on appeal that somehow this video became an important piece of evidence. And I would suggest that what we have is a car with tinted windows, a DA officer present in the car, a confidential informant who, regardless of what we think of him now, had supplied good information in the past. And when you have those set of facts, whether or not Sergeant Mayer could have seen anything from his vantage point when all the evidence suggests that none of the other officials could... That doesn't go to whether the video existed or was corruptly destroyed. It might be that it would be no harm, no foul, because there wasn't anything that could have been useful. Well, I certainly think that all the testimony in the case would be that it would not have shown anything of value because of the way the buy went down. So I look at... Let me ask you this about the law relating to the grand jury. Assuming you're correct that Mayer didn't do anything that himself went before the grand jury, the indictment is sort of a shield for everybody. If that falls, if it were to fall because of Lucas's involvement, does the fact that Mayer wasn't before the grand jury continue to save him or simply the shield has fallen and now we have to look at Mayer's facts on their own? Did it violate the constitutional rights? I think the fact that Sergeant Mayer never ID'd Joshua in the prosecution, regardless of what the court determines with the grand jury proceeding, would shield him from any liability to Mr. Webb. Okay, any other questions? Thank you. Mr. Lowy, you have your seven minutes for rebuttal. I probably ate into that a bit, Your Honor. You have whatever's left. Counsel, that's good of you to note. Go ahead. Your Honor, on the grand jury point, they say that there's nothing false told the grand jury. The very basic fact that Mr. Lucas stood in front of the grand jury and said we ensnared Webb in a drug deal was itself fraudulent. Because if you credit our evidence, which the jury might, then Lucas knew that Webb had been framed. Because Bray says, me and Lucas made a deal to frame Webb. So if Lucas then gets in front of the grand jury and says, let me tell you about Webb's drug deal, then it's fraudulent. And they can't then hide behind the grand jury indictment. I mean, I understand the law about a grand jury indictment breaks the chain, but you can't fraudulently procure a grand jury indictment by lying to the grand jury and then seek immunity. It's that basic. Granted, if we accept their testimony that Lucas, in good faith, told the grand jury it was Webb, then they should win. But if the jury accepts our testimony, then Lucas got in front of the grand jury, and like he did over and over and over again in Operation Turnaround, he lied. What did he say? He said, you can't prove, you Robertson plaintiffs, that your rights were violated. You can't prove he lied about you. You guys pled guilty. Some of you were doing drug deals. But Robertson, and specifically the Keek Conservants said, some Operation Turnaround plaintiffs have proved, there is evidence, they specifically said, there is evidence that some Operation Turnaround plaintiffs were framed knowingly by law enforcement. And they're two things. You started out by saying, okay, and we could read the grand jury testimony ourselves. You said, Lucas said we ensnared Webb in a drug deal, period. That's a summary. Did he say before the grand jury, I saw Webb at such and such a time? Can you point to more specific statements than that? I don't have the grand jury testimony in front of me, but I am familiar with it. And what he is saying is, let me give you the probable cause to believe Webb committed a drug deal. Now, he's saying to himself, hmm, I know Webb wasn't there because Bray told me. So the whole thing is fraught. This is not legitimate law enforcement. You can't, if you know that the guy's been framed, you can't mislead a jury into thinking that Webb is guilty. Essentially, to put a hypothetical, if you're testifying on a grand jury murder, and you know for a fact the person didn't commit the murder, but every statement you make is true, maybe you bamboozle the grand jury, but you say, okay, Ms. Jones went to Harvard in 1983, and she's five feet, three inches tall, and she drives a certain kind of car. And if every one of those statements is true, does that... Do you have a case or an example that would in fact say that that's enough to break the grand jury chain? It's an I don't think that's true here. I think he said things that were affirmatively false. And the reason I think that we still win, even under that hypothetical, is because the case law is not, did he lie to the grand jury? It's, did he mislead the grand jury? It says, was the grand jury misled? And if you know that he's innocent, then saying a bunch of true things to give the jury the wrong impression is in fact misleading the grand jury. And this is the quintessential example of exactly what we're alleging here, is that Lucas knew that Webb and others had been framed, and he went in and misled the grand jury. There's another point, Your Honors, that... What's your best case to show misleading the grand jury instead of falsifying? I'd think that people would bring that up all the time, because they claim, who was it? A famous person said that you could get a grand jury to die at a cheeseburger or something like that. Mally V. Briggs. I think there's a long line of cases that you can rely on a neutral magistrate's determination as long as you haven't deceived the neutral magistrate. And that's what we're alleging here, and that's what the evidence shows, if it's credited. The red brief, they don't have a quote, but this is closer to what I usually think of the being that established probable cause, unless it was based on knowing or recklessly false evidence. Now, I say I don't have the exact quote, and it may be that that's part of what we have to do is, is it as weak, let us say, as misleading, or is it strong enough to say that the kind of thing you're talking about is false evidence, even if it isn't line by line untrue? Do you have any legal doctrine either way on that? Do you see where I'm going in terms of how exactly you state what it is that breaks the chain? And I think we show all of them. I think he lied affirmatively, I think he misled, but I think we have to step back, Judge Boggs, and say, what are we saying when we say that you can't rely on a grand jury indictment? We're saying if it was fraud, if it was misdirection, if they misled, and that's... Well, there's a misleading versus fraud. Of course, you can prove fraud a number of ways, you don't have to have a line by line lie, but it is more than misleading in the sense that we see in Congress all the time, somebody testifies, and then the senators get all up in arms and say, oh, you misled us, which just usually means we disagree with you. So... Well, Your Honor, I have about 30 seconds left, and there's a number of other points I was hoping to cover. Well, quickly. I'll run through them fast. They say that the district court didn't find any false statements. Your Honors, the district court didn't know about this evidence because they withheld it until after summary judgment was briefed, and that is egregious. And I hope, Your Honors, they're as troubled by that as we are, that the evidence before, Your Honor, wasn't before Judge Boyko, it wasn't fair to Judge Boyko to have to decide this without that evidence. How is it that it gets before us? Well, because... Usually the district court record closes when the district court finishes. The district court gave us permission to reopen the record, and that's the discussion about... That was on your motion. So it was before him in the sense that he knew about it before he closed the case. He did, but he said, I'm done with this, I've already had... Yes, it's not that he didn't literally know in his head before he sent the case or closed the case, sent it up to us, right? That's why there's appellate court, Your Honor. He said he was not persuaded, he wrote a three page order. Okay, I think we can handle it from there. Alright, that case will be submitted. Deep breath.